**July 15, 2016**

# In the Court of Appeals of Georgia

A16A0240. WRIGHT v. THE STATE.                                    PE-008C

PETERSON, Judge.

Following his arrest for DUI, Wright filed a motion in limine to exclude the results of the state-administered breath test on the basis that he requested, but was not given, an independent chemical test of his blood. The trial court denied Wright's motion, concluding that Wright did not request an independent test. Wright was subsequently found guilty of DUI per se, DUI less safe, and two counts of speeding. The trial court merged the two speeding counts and also merged the DUI less safe count with the DUI per se count for sentencing purposes.

On appeal, Wright argues that the trial court erred in admitting the results of the state-administered test because he was not given an independent test after requesting one. We agree that, under our existing precedent, Wright's statements to

the arresting officer could reasonably be construed as a request for an independent test and, therefore, the state-administered test results should have been suppressed. Accordingly, we reverse Wright's DUI per se conviction and vacate the guilty verdict on the DUI less safe count. Because Wright does not challenge his conviction for speeding, we affirm that conviction.

1. In his sole enumeration of error, Wright argues that the trial court erred in failing to suppress the results of the state-administered breath test because he was unjustifiably denied his statutory right to obtain an independent test. We agree.

(a) *Pertinent facts*

A trial court's factual findings when ruling on a motion in limine to exclude the results of a state-administered chemical test should not be disturbed by a reviewing court if there is any evidence to support them. *England v. State*, 302 Ga. App. 12, 14 (1) (689 SE2d 833) (2009). However, we "owe[] no deference to a trial court's factual findings gleaned from a review of a videotape that are not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence." *Clay v. State*, 290 Ga. 822, 825 (1) (A) (2) n.1 (725 SE2d 260) (2012). The trial court's application of the law to undisputed facts when ruling on such a motion is reviewed de novo. *Id.*; *see also Jones v. State*, 291 Ga. 35, 36-37 (1) (727 SE2d

2

456) (2012) (where "the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts").

The evidence in this case, which is largely undisputed or can be gleaned from a videotape, shows that in May 2014, Officer Streeter of the DeKalb County Police Department clocked Wright's vehicle traveling at 79 miles per hour in a 55-mile-per-hour zone. Officer Streeter conducted a traffic stop and noticed an odor of alcohol while speaking to Wright. During his conversation with the officer, Wright admitted that he had consumed "a couple of beers." Wright agreed to participate in field sobriety testing, in which he exhibited all six indicators on the HGN test, two out of eight indicators on the walk and turn test, and one out of four indicators on the one leg stand test. After observing Wright's performance on the field sobriety tests, Officer Streeter then asked Wright to submit to an Alco-sensor test of his breath, and Wright agreed. The results of the Alco-sensor were positive, and Officer Streeter placed Wright under arrest for DUI. Wright pleaded with Officer Streeter to give him a warning, stating that he was very close to become a police officer himself.

Officer Streeter then read the implied consent notice to Wright, and asked Wright if he would submit to a breath test. After Officer Street finished, the following discussion ensued:

Wright: Sorry, was that a question?

Officer Streeter: Yes, sir.

Wright: So you said what: Will I, will I submit to a chemical blood test?[1]

Officer Streeter: No, of your breath. Will you submit to a state-administered chemical test of your breath under the Georgia implied consent law?

Wright: Right now?

Officer Streeter: I mean, you will be taken to the Intoxilyzer room to submit to state-administered test of your choosing.

Wright: Why do I have to do it right now? I don't understand.

Officer Streeter: Okay, when else am I supposed to do it?

---

[1] Officer Streeter testified that Wright, in a different segment of the video, also made statements that he thought states generally requested blood samples. After reviewing the different parts of the video recording, we were unable to locate these statements by Wright, and it may be that the statements were not recorded. In any case, Officer Streeter's testimony as to Wright's statements is undisputed and was credited by the trial court.

Wright: I mean what — I don't understand what is going on right now. Can you please explain what's going on?

Officer Streeter: As much as I can explain is, you have been arrested for DUI.

Wright: All right.

Officer Streeter: What I read to you is the Georgia implied consent law in reference to your license.

Wright: All right.

Officer Streeter: That's the full [unintelligible]. At the end is a question that states, "Will you submit to a state-administered chemical test of your breath under Georgia implied consent law?"

Wright: What if I say no?

Officer Streeter: I can reread this card to answer your question.

As Officer Streeter was re-reading the implied consent notice and explaining that Wright's license would be suspended if he refused the state-administered test, Wright interrupted and said, "Oh no, no, no, no, no, no. Yes, I will do it. Yes." When Officer Streeter finished reading the notice, the following conversation transpired:

Wright: You said after a period of time I get to do what?

Officer Streeter: I don't understand your question.

5

Wright: You said after a period of time I get to submit to another chemical blood test or something like that?

Officer Streeter: After first submitting to the required state test, you are entitled to an additional independent test.

Wright: How soon?

Officer Streeter: Of your blood, breath, urine, or other bodily substances at your own expense by an operator of your choosing.

Wright: How much does it cost? Do you know?

Officer Streeter: I'm not sure how much an independent test costs.

Wright then asked if he would lose his license if he failed the test, and Officer Streeter replied that he could not answer Wright's question. Wright subsequently agreed to take the state-administered chemical test.

Wright was then placed in the patrol car. While in the patrol car, Wright again asked to be let off with a warning, stating that he was not that impaired and that a lot of people leave bars more impaired than he was. Wright subsequently asked, "Where I gotta do my blood test at?" Officer Streeter responded that it would be "in the intox room." Wright asked whether that room was in the jail, and Officer Streeter answered that it was "a part of the jail. It's in a different section." When Wright arrived at the

detention center, he submitted to the Intoxilyzer breath test, the results of which revealed he had a blood alcohol concentration of 0.096 grams. Wright did not make any further statements about an independent test.

(b) *Requirement to give implied consent notice and provide a suspect with an independent chemical test if requested*

Under OCGA § 40-6-392(a)(3), a person who is accused of DUI and is subjected by the State to a chemical analysis of the person's blood, urine, breath, or other bodily substance may have a "qualified person of his own choosing administer a chemical test or tests in addition to any administered at the direction of a law enforcement officer." Upon arresting an individual for DUI, a police officer must read one of the three implied consent notices to the suspect. OCGA § 40-5-67.1(b); *State v. Gaggini*, 321 Ga. App. 31, 34-35 (1) (b) (740 SE2d 845) (2013). The applicable notice for suspects aged 21 or over informs suspects that, upon submitting to a state-administered test, they have a right to an independent test. Specifically, the applicable informed consent notice provides

> Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on

7

the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. *After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing.* Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?

OCGA § 40-5-67.1(b)(2) (emphasis added). OCGA § 40-6-392(a)(3) provides that "[t]he justifiable failure or inability to obtain an additional test shall not preclude the admission of evidence relating to the test or tests taken at the direction of a law enforcement officer[.]" OCGA § 40-3-392(a)(3).

Under this statutory framework, this Court has concluded that when a suspect "requests an independent test but is unable to obtain it, the results of the State-administered test cannot be used by the State as evidence against [him] unless the failure to obtain the test is justified." *Ladow v. State*, 256 Ga. App. 726, 728 (569 SE2d 572) (2002) (citation and punctuation omitted). In setting a standard for what amounts to a request, the *Ladow* Court concluded that "[a]n accused's right to have

8

an additional, independent chemical test or tests administered is *invoked by some statement that reasonably could be construed, in light of the circumstances, to be an expression of a desire for such test.*" *Id.* (emphasis added).[2]

Although we have quoted this standard consistently since *Ladow*, simply articulating a standard — without more — does not necessarily render the quoted language part of the holding of the case that is binding on subsequent panels of this Court. Judicial decisions are not statutes; we are not obligated to mine every word in a previous opinion for meaning. "It is, of course, axiomatic that a decision's holding is limited to the factual context of the case being decided and the issues that context necessarily raises. Language that sounds like a holding — but actually exceeds the scope of the case's factual context — is not a holding no matter how much it sounds like one." *Ga. Interlocal Risk Mgmt. Agency v. City of Sandy Springs*, No.

---

[2] Since establishing the "reasonably could" standard in *Ladow*, we have invoked this standard in at least 11 other decisions. *See Farmer v. State*, 335 Ga. App. 679, 681 (782 SE2d 786) (2016); *Avery v. State*, 311 Ga. App. 595, 598 (716 SE2d 729) (2011); *England*, 302 Ga. App. at 14 (1); *Mathis v. State*, 298 Ga. App. 817, 818 (1) (681 SE2d 179) (2009); *Waterman v. State*, 299 Ga. App. 630, 631 (683 SE2d 164) (2009); *Collins v. State*, 290 Ga. App. 418, 420 (2) (659 SE2d 818) (2008); *Fowler v. State*, 294 Ga. App. 864, 866 n.2 (1) (a) (670 SE2d 448) (2008); *Anderton v. State*, 283 Ga. App. 493, 494 (1) (642 SE2d 137) (2007); *Brooks v. State*, 285 Ga. App. 624, 626 (647 SE2d 328) (2007); *State v. Gillaspy*, 270 Ga. App. 111, 112 (605 SE2d 835) (2004), *Johnson v. State*, 261 Ga. App. 633, 636 (2) (583 SE2d 489) (2003).

A16A0134, 2016 Ga. App. LEXIS 344, 2016 WL 3027526, at *1 n.1 (Ga. Ct. App. May 24, 2016) (citation and punctuation omitted). It is only the holdings of previous cases that bind us here.

When considered in the context of *Ladow*, it is unclear whether this "reasonably could" standard was part of the holding. There, we set out the standard, and then considered facts that, in retrospect, might reasonably appear to some as ambiguous. The trial court denied the motion to suppress on the basis that the officer reasonably construed the defendant's statements not to be a request for an independent test. We reversed, and used language indicating that we did not believe the officer's interpretation to have been reasonable. *See Ladow*, 256 Ga. App. at 729 ("we cannot accept the State's position that the officer reasonably construed Ladow's statement as referring to a certain type of State-administered test"). And in concluding our analysis, we said "that Ladow's statement, 'I want a blood test,' sufficiently articulated her desire to have an additional, independent test such that a law enforcement officer *reasonably would* have understood her statement to be a request for one." *Id*. (footnote omitted; emphasis added).

But our subsequent decision in *Johnson* dispels any doubt as to whether the "reasonably could" standard is binding on us. There, after the officer read the

10

defendant the implied consent notice and requested a breath test, the defendant responded by saying "I'll take a urine test." 261 Ga. App. at 634. The officer responded by clarifying that she was requesting that he take a breath test, and that if the defendant wanted a different test, he could take one after taking the state-administered breath test. *Id.* Later, while still on the scene, the defendant asked "when can I take my chemical test?" *Id.* The officer replied that the defendant would be taken to the jail for his test, where he later submitted to a breath test. *Id.* The defendant did not subsequently request a urine test. *Id.*

We characterized the defendant's statement "I'll take a urine test" in response to the officer's reading of the implied consent notice as "express[ing] his preference to take a urine test rather than the state-administered breath test." *Id.* at 637 (2). We then concluded that, in conjunction with the subsequent question about when he could take his "chemical test," the defendant's statements "reasonably could be construed" as a request for an independent test and, thus, that the trial erred in admitting the results of the state-administered test. *Id.* Under those circumstances — as ambiguous as those here — we reversed the trial court because the defendant's statements "reasonably could be construed" as a request for an independent test. In context, that standard was necessarily part of the holding of the case. It has not

11

subsequently been overruled or disapproved; to the contrary, we have quoted that language repeatedly. Accordingly, it is binding on us here.

Although *Ladow* sets forth the "reasonably could" standard, our implied consent warning itself does not "specif[y] to the accused any requirements for requesting [an independent] test — linguistically, temporally, or otherwise." *Ladow*, 256 Ga. App. at 728. Therefore, in evaluating whether a particular statement or question is a request for an independent test, context matters:

• In *Ladow*, we held that a defendant requested an independent test when she interrupted an officer's reading of the implied consent notice to say, "I want a blood test." *Id.* at 729. We noted that the officer was on notice that the defendant likely knew of her right to an additional test because she told the officer as he began to read the notice that she had "already heard all that." *Id.*

• Another defendant who similarly interrupted the reading of the implied consent notice by asking "could I get a blood test?" was deemed not to have requested an independent test, however. *See Mathis*, 298 Ga. App. at 818-19 (1). Noting that the defendant said nothing more about any test, we found that, "[i]n the context in which they were given," the defendant's words could not be

12

reasonably construed as a request for an independent test, but appeared to be an inquiry regarding the type of test the State would administer. *Id*. at 818.

• In a different context, we found that a defendant made a "plain" and "unambiguous" request for an independent test where the defendant stated he knew he had a right to do a blood test and wanted to have one, agreed to a breath test after being read the implied consent warning, and then asked about obtaining a separate blood test while the police officer was inputting information into the intoxilyzer machine. *See McGinn v. State*, 268 Ga. App. 450, 452 (602 SE2d 209) (2004).

(c) *Application of the "reasonably could" standard*

Here, considered in context, Wright's statements and questions reasonably could be construed as a request for an independent test. In particular, after he was placed in the patrol car, he inquired,"Where I gotta do my blood test at?" On the one hand, hypothetically, if this question had been posed immediately after the officer sought his consent to a chemical test, this question could reasonably have been viewed only as an inquiry as to the location of that test, not a request for an independent test. On the other hand, if the question had been posed after the

13

administration of the breath test at the jail, it clearly would have reflected a desire for an independent test of an alternative means.

Wright's question, in context, falls somewhere in between these hypotheticals. He previously made some comments indicating that he understood the usual test requested of detainees was a blood test, suggesting he may have misunderstood what the officer was requesting of him or thought the state test should be a blood test. But he also expressed some interest in an independent test, asking when such a test would take place and how much it would cost. In that context, Wright's question — "Where I gotta do my blood test at?" — is ambiguous.

At the hearing on Wright's motion in limine, the trial court concluded that, upon reviewing the video recording of the arrest, he did not hear Wright say, "I want" an independent test. The trial court subsequently denied Wright's motion, crediting Officer Streeter's testimony that Wright never asked for an independent test. In the absence of an unambiguous request, the trial court essentially deferred to the arresting officer's assessment of whether Wright had requested an independent test. But that is not the approach our case law mandates. We repeatedly have said that a right to an independent test is invoked by "some statement that reasonably could be construed" as a request for such a test. *See, e.g., Ladow*, 256 Ga. App. at 728. By its terms,

14

"reasonably could" means we must treat a defendant's statements as a request if reasonable people could disagree about whether those statements expressed a desire for an independent test. The fact that Wright's ambiguous statements reasonably could support two different interpretations — either as a request for an independent test or not — requires us to resolve the ambiguity in his favor, because his statements "reasonably could" be construed as a request for an independent test.

This case is like *Johnson*, in which we reversed the trial court's admission of the state-test results because we concluded that the defendant's question, "When can I take my chemical test?", could be construed as a request for an independent test. 261 Ga. App. at 637 (2). As explained above, we held that the defendant's question, coupled with the defendant's expression of a preference to take a urine test rather than the state-administered breath test, "could be construed to be an expression of a desire for an independent urine test." *Id.* at 637 (2). The facts of this case are not appreciably different: The defendant inquired about taking a test different from the sort being sought by an officer (asking, "You said after a period of time I get to submit to another chemical blood test or something like that?"), agreed to the officer's choice of test, then, before the State administered its test, further asked about taking his desired sort of test. As in *Johnson*, we conclude that Wright's statements reasonably

15

could be construed as requesting an independent blood test and that the trial court erred by failing to suppress the results of the state-administered breath test. Consequently, Wright's conviction for DUI per se must be reversed. Moreover, because the evidence of state-administered results had to be excluded, there is insufficient evidence to support the DUI per se offense, and Wright may not be retried on that count. *See State v. Caffee*, 291 Ga. 31, 34 (3) (728 SE2d 171) (2012).

2. Because we reverse Wright's conviction for DUI per se, the merged DUI less safe offense becomes "unmerged" and a conviction and sentence could be entered on that verdict on remand.[3] *See Allaben v. State*, 294 Ga. 315, 320-21 (2) (b) (751 SE2d 802) (2013), *overruled in part on other grounds by State v. Springer*, 297 Ga. 376, 383 (2) n.4 (774 SE2d 106) (2015). However, if a defendant raises an issue on appeal that, on remand, would bar entry of a conviction on a verdict that was merged or vacated, it is appropriate to address that issue. *Allaben*, 294 at 321 (2) (b). Here,

---

[3] Wright was not convicted of DUI less safe because the trial court merged the DUI less safe offense into the DUI per se count. *See Slack v. State*, 288 Ga. 659, 661 (2) (706 SE2d 447) (2011) (explaining that guilty verdicts are not the equivalent of convictions; where trial court merged two counts for which double jeopardy prohibited multiple convictions, count that was merged into the other "stood vacated by operation of law"); *Durrance v. State*, 319 Ga. App. 866, 866 n.1 (738 SE2d 692) (2013) ("[Defendant] was not convicted of the DUI less safe offense, however, because the trial court merged the offense into the DUI per se charge.").

16

Wright challenged his DUI "convictions" based on the erroneous admission of the test results, and we interpret this argument as including a challenge to the guilty verdict on the DUI less safe offense. Consequently, we must determine whether the error related to Wright's DUI per se offense was harmful to the finding of guilt on the DUI less safe offense.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Lindsey v. State*, 282 Ga. 447, 450 (651 SE2d 66) (2007) (citation omitted). "If the error is relevant to the issues in dispute, not cumulative of other evidence, not beneficial to the defendant and uncorrected by the trial court, then there is perhaps no reason for saying it is harmless, but it may nevertheless be harmless in the context of the entire case." *Id.*

Here, the results of the state-administered test were relevant to the key issue of the case — whether Wright was driving under the influence — and this evidence was not cumulative of other evidence and was detrimental to Wright. Although the remaining evidence in the case is sufficient under *Jackson v. Virginia*, 443 U.S. 307 (99 S. Ct. 2781, 61 LE2d 560) (1979), that is a lower standard than we apply for harmless error. To support a conviction for DUI less safe, there must be evidence that the defendant was operating a moving vehicle while under the influence of alcohol

17

to the extent that it was less safe for him to drive. *State v. Young*, 334 Ga. App. 161, 165 (778 SE2d 402) (2015). Although Wright admitted to drinking alcohol, which was confirmed by the positive reading from the alco-sensor, and he failed several parts of the field sobriety tests, he also passed other parts of the field sobriety testing and there was no evidence that Wright had other indicators of being under the influence, like slurred speech. Additionally, although Wright was speeding along I-285, the parties do not suggest this is an unusual occurrence along that interstate, and there is no evidence that he was otherwise driving unsafely. Because there was not considerable evidence that Wright was under the influence of alcohol to the extent that it was less safe for him to drive, and because the results of the state-administered test was relevant to this issue, it is seems likely that the erroneous admission of the state-administered test results contributed to the guilty verdict for DUI less safe.

The dissent argues that the admission of the test results was not harmful to the finding of guilt on the DUI less safe offense because a judge, not a jury, rendered the verdict in the case, and we can safely presume the judge did not consider the inadmissible test results. The dissent is right that we usually presume that judges, unlike juries, consider only admissible evidence. *See* Dissent at 3-4. But this rule must necessarily be inapplicable when the judge improperly admitted the evidence.

18

Here, the judge admitted the test results, and thus obviously believed the test results were admissible. And test results are relevant in considering DUI less safe charges. *See Jaffray v. State*, 306 Ga. App. 469, 471 (1) (702 SE2d 742) (2010); *Webb v. State*, 277 Ga. App. 355, 357 (1) (626 SE2d 545) (2006). Thus, by the very rule invoked by the dissent, we can safely presume that the judge did consider all evidence he believed to be both relevant and admissible, and thus considered the test results in finding Wright guilty on DUI less safe, rendering the admission of the test results harmful error.

Accordingly, the finding of guilt for DUI less safe is vacated. However, because we have determined that the evidence was sufficient to support a finding of guilt on that count, double jeopardy does not bar the State from retrying Wright for that offense.

*Judgment affirmed in part, reversed in part, and vacated in part and case remanded . Phipps, P. J. and McFadden, Branch, and McMillian, JJ. concur. Dillard and Mercier, JJ. concur specially. Ellington, P. J. concurs in judgment only. Miller, P. J. concurs in part and dissents in part.*

19

A16A0240.  WRIGHT v. THE STATE.                                    PE-008C


PETERSON, Judge, concurring fully and specially.

I concur fully in the majority opinion that I have authored.  I write separately

to express doubt as to the soundness of the binding precedent that the majority

opinion follows.[1]

The *Ladow* "reasonably could be" standard — binding precedent that

commands our obedience — determines the outcome of this case.  I question,

---

[1] I express these doubts in a separate opinion because they are not necessary
to the disposition of the case and thus, I think, not appropriate for inclusion in the
majority opinion. *See*, *e.g.*, *U.S. v. Farmer*, 627 F.3d 416, 422 (9th Cir. 2010) (Bybee,
J., specially concurring) (author of majority opinion also authored concurring opinion
expressing concerns about binding caselaw applied by majority).

however, the soundness of that standard. It strikes me requiring too little of a defendant, because it is not enough to put all reasonable arresting officers on notice that immediate action is required. Taken to its logical conclusion, the *Ladow* standard means that a defendant could make ambiguous statements, the arresting officer could reasonably conclude that the statements did not express a desire for an additional test (and thus not provide for one), and then a reviewing court could nevertheless conclude that a hypothetical reasonable officer might have arrived at a different conclusion (and thus exclude from evidence the otherwise admissible state-mandated test results). And indeed, that's precisely what happened here.

Whether statements "reasonably *could* be" construed as expressing a desire for an additional test is not, then, an exacting test. In stark contrast, we require unambiguous requests — the higher standard of "reasonably *would*" — when determining whether a defendant has invoked his or her Sixth Amendment right to counsel by requesting an attorney:

> [T]he suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

2

*Davis v. United States*, 512 U.S. 452, 459 (114 S. Ct. 2350, 129 LE2d 362) (1994) ( citations and punctuation omitted).

Given that the statutory right to an independent test "is not one of constitutional dimension but a matter of grace bestowed by the Georgia legislature," *Padidham v. State*, 291 Ga. 99, 101 (2) (728 SE2d 175) (2012) (citation and punctuation omitted), I question the necessity of protecting it so much more vigorously than the Sixth Amendment right to counsel that sits at the core of our adversarial system of justice. I see nothing in our law that requires this to be the standard.

*Ladow* cited as authority for the standard our decision in *Church v. State*, 210 Ga. App. 670, 671 (1) (436 SE2d 809) (1993). *See Ladow*, 256 Ga. App. at 728 n.6 (citing *Church*). But *Church* contains no language that resembles the *Ladow* standard; rather, there we affirmed the trial court's conclusion that the "defendant did not effectively communicate to the officers any desire for an additional test." *Church*, 210 Ga. App. at 671 (1). And OCGA § 40-6-392 does not contain any language supporting the *Ladow* standard. Indeed, the key language of that statute provides that evidence should not be excluded when the failure to obtain a test is "justifiable." *See* OCGA § 40-6-392(a)(3). It seems far from clear that an officer's reasonable, on-the-

spot conclusion that a defendant's statements did not constitute a request is unjustifiable simply because those statements are also open to an alternative interpretation when viewed at much greater length by a reviewing court.

The "reasonably could" standard requires law enforcement to make difficult judgment calls on the spot, not only about their interpretation of a defendant's statements, but about how someone else might interpret those statements differently. The Supreme Court of the United States identified similar concerns in determining that defendants must make clear, unequivocal requests for counsel to invoke their Sixth Amendment right to counsel. *See Davis*, 512 U.S. at 460-62; *see also Green v. State*, 291 Ga. 287, 292 (4) (728 SE2d 668) (2012) (discussing *Davis* and the benefits of clear and easily applicable rules for law enforcement to follow). Requiring an unequivocal request for an independent test would serve the same purpose.

But although I question the soundness of the *Ladow* standard, my doubts "are not reason enough to revisit it in this case."[2] *Benefield v. Tominich*, 308 Ga. App. 605, 613 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante). As then-Judge

---

[2] At least, for this Court at this time. *But see* Supreme Court Rules 38-45 (governing petitions for certiorari).

Blackwell observed in *Benefield*, "the application of the doctrine of *stare decisis* is essential to the performance of a well-ordered system of jurisprudence," and "it is the duty of appellate judges to make concessions to *stare decisis*." *Id*. (citation and punctuation omitted). And neither party has asked us to reconsider the *Ladow* standard (much less briefed the issue), "a consideration of great significance." *Id*.

Moreover, reconsidering the *Ladow* standard would require the participation of all fifteen judges of our Court. *See* Stephen Louis A. Dillard, Open Chambers: Demystifying the Inner Workings and Culture of the Georgia Court of Appeals, 65 Mercer L. Rev. 831, 853 (2014) (explaining that, by internal court rules, overruling of precedent requires the participation of all 12 (now 15) judges). And, under the circumstances of this case, this convening of our whole court would have had to begin in the last week of the final term in which to dispose of this case under our Constitution's two-term rule. *See* Ga. Const. art. VI, § 9, para. 2. ("the Court of Appeals shall dispose of every case at the term for which it is entered on the court's docket for hearing or at the next term"). Convening an en banc court at any time is "costly to an appellate court in terms of consumption of its always limited resources of judicial time and energy." *Benefield*, 308 Ga. App. at 613 (Blackwell, J., concurring dubitante) (citations and quotations omitted). Convening an en banc court

5

in the last week of a term — in the absence of any emergency and without the benefit of briefing from either party — would be doubly costly, and would not afford the judges of this Court sufficient opportunity to reflect at length on the potential consequences of departing from relatively well-established precedent. This case does not warrant such a step.

I am authorized to state that Judge Dillard and Judge Mercier join in this special concurrence.

A16A0240. WRIGHT v. THE STATE


MILLER, Presiding Judge, concurring in part and dissenting in part.

I concur in judgment only in Division 1 of the majority's opinion. I understand the majority's concerns about the law in this area, however, as judges we must respond to the law as it stands at the time the case is before us and not as we think it should be.

I must dissent in Division 2 because I do not agree that this Court should vacate Wright's DUI less safe conviction. This case involved a stipulated bench trial in which the state and the defense agreed on the evidence presented, which showed that Wright committed a traffic violation, he admitted that he had a few drinks, and he

1

failed the field sobriety tests, and the alco-sensor confirmed the presence of alcohol. Clearly the trial court was more than capable of discerning between admissible and inadmissible evidence when considering the DUI less safe charge. For this reason, I would affirm Wright's conviction for DUI less safe.

1. As a threshold matter, the majority addresses an argument Wright did not preserve for appellate review – that his DUI less safe conviction was tainted. In a single line, the last line of his brief, Wright merely asserts: "Appellant respectfully requests this Court find the trial court allowed the results of the State-administered test in error, vacate Appellant's *convictions* for DUI, and remand this matter for a new trial." (emphasis supplied.) From this statement, this one word "convictions" in plural form, the majority concludes that Wright preserved the argument it now addresses. I disagree. This is a departure from the Court of Appeals Rules and defies common sense.

The majority's conclusion is clearly flawed. Wright did not make any argument or cite any law in support of this claim, and thus he has abandoned this issue. *Felix v. State*, 271 Ga. 534, 539 n.6 (523 SE2d 1) (1999); Court of Appeals Rule 25 (c) (2). Consequently, despite the very forgiving mandates of the Appellate Practice Act, we cannot and should not reach this issue. The Appellate Practice Act must "be liberally

construed so as to bring about a decision on the merits of every case appealed and to avoid dismissal of any case or refusal to consider *any points raised therein*, except as may be specifically referred to in [the Act]." (Emphasis supplied.) OCGA § 5-6-30. The entire argument and citation to authority in Wright's brief focuses solely on the failure to provide an independent test upon request. Wright does not "*raise therein*" any argument that the inadmissible results of the state-administered test tainted the DUI less safe conviction. Even viewing the notice of appeal, the record, and the enumeration of error combined, Wright did not make the argument that the majority addresses. OCGA § 5-6-48 (f); *Jackson v. State*, 309 Ga. App. 796, 800 (2) (714 SE2d 584) (2011) (concluding that, under this Court's rules, "[t]o the extent Jackson intended to question the sufficiency of the evidence on another basis, his claim of error has been abandoned"). Therefore, this Court should not reach this argument.

2. Even if the issue of the validity of the DUI less safe conviction were properly before this Court, I would affirm Wright's conviction. After all, this was a bench trial. There were no witnesses, no jury, and no disputes about what the evidence showed. "Since this was a bench trial, there was no jury that could have been influenced by the judge's comments. In a bench trial it is presumed that the judge, as the trier of fact, is able to distinguish between competent and incompetent

3

evidence and consider only that evidence which is admissible." (Citation and punctuation omitted.) *Corsini v. State*, 238 Ga. App. 383, 384-85 (2) (519 SE2d 39) (1999). Accordingly, contrary to the majority, I would presume that the trial court is well-versed in the law such that its evaluation of the facts of this case was not influenced by the results of the state-administered test in this stipulated bench trial. *Jones v. State*, 318 Ga. App. 614, 618 (5) (734 SE2d 450) (2012) (absent evidence to the contrary, this Court must presume in a bench trial that the trial court "has sifted the wheat from the chaff and selected the legal testimony from that which is illegal and incompetent") (citation omitted).

At the very least, our citizens must be able to trust our trial courts to evaluate the evidence and make the distinction between what is admissible and what is not for each charged offense. If we do not trust the trial courts, our system of justice will completely erode. Moreover, as the majority concedes, the remaining evidence was sufficient to support a conviction for DUI less safe. Because there was sufficient evidence, and there was no jury that could have been prejudiced by the inadmissible breathalyzer result, I cannot conclude, as the majority does, that there is harmful error. Accordingly, I would affirm Wright's conviction for DUI less safe.

4